CLERK'S OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED

JUN 15 2022

JULIA C. DUDLEY, CLERK
BY: s/ H. MCDONALD
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

| | | |
|---|---|---|
| DENNIS D. SEAMSTER, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 4:21-cv-00021 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| TY ALLEN TAYLOR, *et al.*, | ) | By:   Hon. Thomas T. Cullen |
| | ) |        United States District Judge |
| Defendants. | ) | |

While operating a tractor-trailer owned by his employer and co-defendant Blount International, Inc. ("Blount"), Defendant Ty Allen Taylor (with Blount, "Defendants") collided with the rear of Plaintiff Dennis D. Seamster's farm tractor. Seamster subsequently brought a suit for negligence against Defendants, and the parties engaged in extensive discovery. This matter is presently before the court on several motions *in limine*: (1) Seamster's motion to strike the affidavits of Defendants' liability experts, Tyler Black and Dr. Chris Monk (ECF No. 48); (2) Seamster's motion to strike the revised affidavit of Dr. Monk (ECF No. 61); (3) Seamster's motion to exclude the expert testimony of Black and Dr. Monk (ECF No. 31); (4) Defendants' motion to exclude the expert testimony of Seamster's liability expert James Whelan (ECF No. 33); and (5) Defendants' motion to exclude the expert testimony of one of Seamster's treating physicians, Dr. William Silver (ECF No. 35).

## I.   BACKGROUND

On December 2, 2019, Seamster was driving a 1978 John Deere 4440 farm tractor on 360 East, a four-lane divided highway in Halifax County, Virginia. (ECF No. 49-1, at 3, 65–69.) Seamster was in route to his friend's farm to pick up two bales of hay to feed the cattle

he tended on his mother's farm. (Dep. of Dennis Seamster 52:13–54:13, 62:17–24, Aug. 31, 2021 [ECF No. 38-1].) Seamster ordinarily drove a larger semi-truck to collect hay bales for the farm but, because he only needed two bales that evening, he opted to drive his tractor. (*Id.* at 60:17–63:14.) He does not recall ever driving his tractor to that farm. (*See id.* at 60:17–23, 62:17–22.) Seamster's route to his friend's farm required him to drive a little over a mile on the highway. (*Id.* at 60:14–16.) He intended to drive about a mile along the highway (which has a posted speed limit of 60 miles per hour), make a U-turn at a cut-through, and travel another several hundred yards before making a right turn into his friend's farm. (*Id.* at 53:5–17, 60:14–16.)

At around 5:25 p.m., Seamster was driving approximately 15 miles per hour in the left lane, preparing to turn in about 1,000 feet. (*See* ECF No. 49-1, at 65; Seamster Dep. at 65:8–17; Dep. of James Whelan 31:9–21, Jan. 4, 2022 [ECF No. 38-4].) It was dusk and "still light out, but . . . getting dark." (*See* Seamster Dep. at 54:17–24.) Taylor was driving his tractor-trailer on 360 East at approximately 60 miles per hour when he overtook and collided with the rear of Seamster's tractor. (*See* ECF No. 49-1, at 65.)

According to Seamster, prior to driving on the highway, he turned the tractor's light switch to the "H" position, which should have illuminated the tractor's two front warning lamps, two rear warning lamps, two headlights, and two taillights. (Seamster Dep. at 81:12–82:9.) The light switch recovered at the scene of the accident was indeed turned to the "H" position. (ECF No. 49-1, at 55.) As required by law, the tractor displayed a slow-moving vehicle ("SMV") emblem. (*See id.*) But only a small fragment of the SMV emblem survived the crash:



(*See id.*) Photographs taken at the scene of the accident reveal that the front-left side of the tractor-trailer collided with Seamster's tractor. The force of the collision separated the cab of the tractor from its base and splintered the tractor into many pieces.





(*Id.* at 25–27.)

On April 20, 2021, Seamster filed suit in the Circuit Court of Halifax County against Taylor and his employer, Blount (the owner of the tractor-trailer), alleging negligence and

seeking compensatory damages for personal injuries he sustained in the accident. (Compl. ¶¶ 14–20 [ECF No. 1-1].) Defendants removed the case to this court. (*See* ECF No. 1.) The court originally set the case for trial beginning March 28, 2022, but continued the trial until October 24, 2022. Prior to the continuance, the parties filed several motions *in limine* related to expert testimony, and Defendants filed a motion for summary judgment. (ECF Nos. 31, 33, 35, 37, 48, 61.)[1] Seamster seeks to strike the affidavits of Defendants' liability experts Black and Dr. Monk, as well as the revised affidavit of Dr. Monk. (*See* ECF Nos. 48, 61.) Seamster also seeks to exclude portions of the testimony of both liability experts. (*See* ECF No. 31.) Defendants filed a motion to exclude Seamster's liability expert, Whelan, and the testimony of Seamster's treating physician, Dr. Silver. (ECF Nos. 33, 35.)

In addition to reviewing the record and the parties' briefing, the court held a hearing on these motions on June 7, 2022. For the reasons explained below, the court will grant in part and deny in part Seamster's motion to strike the affidavits and revised affidavits of Defendants' liability experts; grant Seamster's motion to exclude a portion of Black's expert testimony; deny Seamster's motion to exclude the testimony of Dr. Monk; grant in part and deny in part Defendants' motion to exclude the expert testimony of Whelan; and grant in part and deny in part Defendants' motion to exclude the testimony of Dr. Silver.

---

[1] The Defendants' motion for summary judgment relies heavily on arguments to exclude the testimony of Seamster's liability expert, Whelan. As such, the court will address these motions *in limine* before resolving the motion for summary judgment.

## II.   ANALYSIS

### A. Motion to Strike Expert Affidavits: Tyler Black and Dr. Chris Monk

Seamster moves to strike the affidavits of Defendants' liability experts, Tyler Black, M.S., P.E., and Dr. Chris Monk, as well as the revised affidavit of Dr. Monk. (ECF Nos. 48, 61.) Black is an expert in accident reconstruction, and Dr. Monk is an expert in human factors.[2] Seamster filed motions to strike all three affidavits, asserting that "Black and [Dr.] Monk offer previously undisclosed opinions in their respective affidavits." (Pl.'s Br. Supp. Mot. Strike at 1–2 [ECF No. 49].) Seamster further represents that, "[b]ased upon the designations and opinions disclosed, [he] elected not to depose Black or [Dr.] Monk during discovery . . . ." (*Id.* at 2.) Defendants timely disclosed both experts on November 8, 2021, and submitted their expert reports under Federal Rule of Civil Procedure 26(a)(2)(B). Defendants attached affidavits by both experts as exhibits supporting their motion for summary judgment filed on January 21, 2022. (ECF Nos. 38-7, 38-8.) Defendants attached a revised affidavit by Dr. Monk to their reply brief. (ECF No. 60-9.)

Federal Rule of Civil Procedure 26(a)(2)(B) requires a party to disclose retained expert witnesses and to include in those disclosures "a complete statement of all opinions the witness will express and the basis and reasons for them," along with "the facts or data considered by the witness in forming them." Rule 37(c)(1) mandates that, if a party does not properly disclose information or witnesses under Rule 26, it may not use that information "to supply evidence

---

[2] Dr. Monk explains that his work in the field of human factors "relates to the analysis and evaluation of human behavior and performance, including issues such as inattentive driving, visibility, perception-reaction, attention and control, nighttime and low light perception and vision, and crash avoidance." (ECF No. 49-2, at 1.)

on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."

Rule 26(e) requires expert witnesses to supplement their reports in limited circumstances to correct inaccuracies or upon learning new information. *See* Fed. R. Civ. P. 26(e); *Southern v. Bishoff*, 675 F. App'x 239, 249 (4th Cir. 2017) (per curiam). But outside of the narrow circumstances of correcting errors or addressing newly acquired information, a party may not support its motion for summary judgment with affidavits or supplemental reports that contain previously undisclosed expert opinions. *See Southern*, 675 F. App'x at 249; *McCall v. Hoke Cnty.*, No. 1:16-cv-141, 2017 WL 4477293, at *7 (M.D.N.C. July 12, 2017). Courts routinely reject such improper supplementation as "poorly disguised attempts to counter [opposing parties'] arguments with new expert analyses." *Southern*, 675 F. App'x at 249; *see, e.g.*, *E.E.O.C. v. Freeman*, 778 F.3d 463, 467 n.7 (4th Cir. 2015); *Walker v. DDR Corp.*, No. 3:17-cv-01586, 2019 WL 1349514, at *4 (D.S.C. Mar. 26, 2019); *McCall*, 2017 WL 4477293, at *7; *Priester v. Futuramic Tool & Eng'g Co.*, No. 2:14-cv-01108, 2017 WL 193577, at *5–6 (D.S.C. Jan. 18, 2017); *Swimways Corp. & Vap Creative, Ltd. v. Zuru, Inc.*, No. 2:13-cv-334, 2014 WL 12573390, at *3–4 (E.D. Va. July 10, 2014).

When a party attempts to rely on improperly disclosed expert testimony, the Fourth Circuit has set out the following factors for courts to apply to determine whether that improper disclosure was nonetheless substantially justified or harmless: "(1) the surprise to the party against whom the witness was to have testified; (2) the ability of the party to cure that surprise; (3) the extent to which allowing the testimony would disrupt the trial; (4) the explanation for the party's failure to name the witness before trial; and (5) the importance of the testimony."

*S. States Rack & Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 596 (4th Cir. 2003). The party seeking to rely on the improperly disclosed opinion bears the burden of persuasion. *Wilkins v. Montgomery*, 751 F.3d 214, 222 (4th Cir. 2014). "The court need not consider every *Southern States* factor, and the court is afforded 'particularly wide latitude to [use its] discretion to issue sanctions under Rule 37(c)(1).'" *Marr v. Abercrombie & Fitch Stores, Inc.*, No. 5:14-cv-00123, 2015 WL 3827326, at *6 (E.D.N.C. June 19, 2015) (quoting *Wilkins*, 751 F.3d at 220–21). The typical sanction is exclusion of the challenged material. *See Wilkins*, 751 F.3d at 222.

### 1. Tyler Black, M.S., P.E.

Seamster moves to strike four categories of opinions in Black's affidavit. First, Black's affidavit offers his opinion that, based on his analysis of the lightbulb filaments in the tractor, the left and right taillight bulbs were "definitively cold ('off') at the time of impact . . . ." (Aff. of Tyler Black ¶¶ 10–11, Jan. 21, 2022 [ECF No. 64-3].) Seamster argues that these statements are not consistent with Black's expert report. In his disclosed report, Black explains that lightbulb filaments might exhibit one of two kinds of abnormalities following a collision: "hot shock (the stretching of the filament coil in a hot, illuminated lamp exposed to high accelerations) and cold shock (the fracturing of the filament in a cold, dark lamp exposed to high accelerations)." (ECF No. 49-1, at 13.) In his report, he opines that the tractor's taillights exhibited signs of cold shock and concludes that the evidence "is consistent with" the taillights being off at the time of impact. (*See id.* at 20.)

Seamster contends that there is a "significant difference" between concluding the taillights were "definitively" off and concluding that the evidence is "consistent with" the taillights being off. (Pl.'s Reply Br., at 4 [ECF No. 65].) Defendants argue that these affidavit

statements "provide[] consistent conclusions" with Black's expert report and therefore should not be stricken. (Defs.' Br. Opp'n Mot. Strike at 3–4 [ECF No. 64].) But in the court's view, these are materially different conclusions. Black's disclosed expert report did not offer the opinion that the tractor's taillights were "definitively" off; instead, in his report, Black expressed this conclusion with far less certitude. Indeed, the former provides no room for alternatives, while the latter allows for them. In that respect, Black's opinions about the physical state of this key piece of evidence are materially different. Allowing him to offer a new, previously undisclosed opinion, in an affidavit supporting Defendants' motion for summary judgment, after the close of discovery and well after the deadline to submit expert disclosures and rebuttal experts, creates unfair surprise to Seamster and unduly prejudices him in these proceedings. The other *Southern States* factors do not outweigh the prejudicial impact of this unfair surprise. *See* 318 F.3d at 596. Accordingly, the court will grant Seamster's motion to strike as to these statements in Black's affidavit.

Second, Black offers opinions in his affidavit about how long it would have taken Seamster to reach the cut-through at which he planned to turn if the tractor were traveling at 12 and 18.6 miles per hour. (Black Aff. ¶¶ 15, 17.) Black's expert report states that the tractor's speed prior to the accident was between 12.6 and 18.6 miles per hour. (ECF No. 49-1, at 10.) His report also analyzes the remaining distance that Seamster had to travel on the highway before making a U-turn. (*See id.* at 11.) He concludes that "[a]t a constant speed of 15mph" Seamster would have driven on the highway "an additional 1-minute, 16 seconds" to reach the cut-through. (*Id.*) In his affidavit, Black opines that, at 12 miles per hour, Seamster would

have driven another 1 minute and 35 seconds and that, at 18.6 miles per hour, Seamster would have driven another 1 minute and 1 second to reach the cut-through. (Black Aff. ¶¶ 15, 17.)

Seamster argues that these statements amount to new, and previously undisclosed, opinions. Defendants counter that these statements "provide context" to the court about how long it would have taken Seamster to reach the cut-through at the two other referenced speeds. (Defs.' Br. Opp'n Mot. Strike at 5.) While these statements technically amount to previously undisclosed expert opinions, the court finds that Defendants' failure to disclose these additional calculations were harmless under *Southern States*. *See* 318 F.3d at 596. Black's expert report contained the relevant information necessary to draw these conclusions, including the range of potential speeds at which the tractor can travel and the distance between the crash site and the U-turn cut-through. (*See* ECF No. 49-1, at 10–11.) Based on this information, Seamster cannot genuinely claim to be surprised by the conclusions in Black's affidavit. Black's calculations of the time it would take Seamster to travel a certain distance at different speeds simply require him to perform the same rudimentary equation with slightly different numbers. *See Howe v. City of Akron*, 801 F.3d 718, 748 (6th Cir. 2015) (adopting and applying the *Southern States* factors and holding that the district court abused its discretion in excluding belatedly disclosed backpay calculations when the defendant "had all of the [p]laintiffs' salary information in its possession" and "knew that the [p]laintiffs intended to use Excel simple math—addition, subtraction, multiplication, and division"). The court will therefore deny Seamster's motion to strike these paragraphs.

Third, Seamster moves to strike the paragraphs of Black's affidavit that discuss the concept of "looming." (Black's Aff. ¶¶ 18, 20.) Black's expert report does not contain any

mention of looming, and Dr. Monk was actually designated as Defendants' expert on this concept. The other *Southern States* factors cannot outweigh the prejudicial impact of this unfair surprise. *See* 318 F.3d at 596. Because this opinion was not properly disclosed with Black's expert report, the court will grant Seamster's motion to strike these paragraphs.

Finally, Black devotes two pages of his affidavit to comparing Whelan's (Seamster's liability expert) analysis in this case to expert testimony that Whelan provided in a separate and unrelated case, *see* Decl. of James D. Whelan, *Pakhnyuk v. Orellano*, No. 5:18-cv-00003, at ECF No. 46-3 (W.D. Va. Oct. 18, 2018), *available at* 2018 WL 8664349. (Black Aff. ¶¶ 18–25.) Black purports to apply Whelan's methodology from that prior case to the facts of Seamster's case and, in so doing, offers new opinions regarding concepts like visual expansion rate ("VER") and perception-response time ("PRT"). (*Id.* ¶¶ 19–25.) But Black's expert report does not include any mention of *Pakhnyuk*, Whelan's methodology from that case, or Whelan's opinions in that case regarding VER and PRT. (*See* ECF No. 49-1.) Black's critique of Whelan's methodology in this case as compared to *Pakhnyuk* is outside of the scope of a proper expert opinion; it "reads like a brief or judicial decision, not an expert report[.]" *See Therapure Biopharma Inc. v. DynPort Vaccine Co.*, No. RDB-19-2092, 2021 WL 2719060, at *4 (D. Md. June 30, 2021) (granting motion to strike where expert's supplemental report was essentially "an attack on the credibility and deposition testimony of [the] opposing expert").

Defendants contend that this portion of Black's affidavit is not an attack on Whelan's credibility, but rather is Black providing "contextual background" and explaining how VER and PRT "would have applied to this case if [] Whelan had utilized them in his accident[-]avoidance analysis." (Defs.' Br. Opp'n Mot. Strike at 6.) Even if it were to credit this

- 10 -

characterization, the court still finds that Black's opinions on this matter were not properly disclosed in his expert report. The other *Southern States* factors do not outweigh the prejudicial impact of this unfair surprise. *See* 318 F.3d at 596. Black cannot offer these opinions for the very first time in an affidavit submitted in support of a summary judgment motion. Accordingly, the court will grant Seamster's motion to strike this portion of Black's affidavit.

In sum, the court will grant Seamster's motion to strike as to all challenged portions of Black's affidavit except for his calculations of the remaining travel time between the crash site and the cut-through.

### 2. **Dr. Chris Monk**

Seamster moves to strike three categories of opinions in Dr. Monk's affidavit and his revised affidavit.

First, Dr. Monk's affidavit offers specific measurements (azimuth, altitude, and civil twilight) related to the position of the sun on the date of the accident (December 2, 2019) and the two-year anniversary when he visited the crash scene (December 2, 2021). (Aff. of Chris Monk ¶¶ 3–5, Jan. 21, 2022 [ECF No. 64-4].) Like Black's new calculations of Seamster's remaining time to the cut-through, the court finds that Dr. Monk's technically undisclosed opinions are nonetheless harmless under the factors set forth in *Southern States*. Moreover, Seamster also submitted a video of the light level at the scene of the accident on its two-year anniversary. (*See* ECF No. 52-4.) In his affidavit—submitted with his brief in opposition to Defendants' motion for summary judgment—Seamster stated that the light level in his video accurately reflected the light level on the day of his accident. (Aff. of Dennis Seamster ¶ 10, Feb. 4, 2022 [ECF No. 52-4].) Seamster can therefore hardly claim to be surprised by the

measurements contained in Dr. Monk's affidavit, which merely confirm an assertion Seamster himself already made. The court finds no harm in allowing Dr. Monk to state, in precise terms, the position of the sun on the date of the accident and on the two-year anniversary. The court will deny Seamster's motion to strike as to these paragraphs.

Second, Dr. Monk's affidavit opines that SMV emblems "are subject to degradation over time" based on conditions to which they are exposed, which "impacts the [emblem's] reflective qualities and characteristics."[3] (Monk Aff. ¶¶ 9–10.) But, in his expert report, Dr. Monk did not offer any opinions whatsoever about the condition of the tractor's SMV emblem in this case. (*See* ECF No. 49-2; *cf. id.* at 15–16 (critiquing Seamster's expert's reliance on the SMV emblem for purposes of calculating PRT and looming and highlighting Seamster's expert's failure to test the visibility of the SMV emblem).) Moreover, these opinions only relate to SMV emblems generally and not specifically to the condition of the SMV emblem in this case, which was available for testing. The court finds that these opinions create incurable unfair surprise and are too general to be probative of the underlying issues in the case. This warrants exclusion under *Southern States. See* 318 F.3d at 596.

Finally, Dr. Monk's affidavit states that he and Black's team took video recordings of the crash site on the two-year anniversary around 5:25 p.m. (Monk Aff. ¶¶ 3, 6.) According to the affidavit, the group "adjusted the light level on the camera . . . so that it matched the physical light level [they] observed at the scene." (*Id.* ¶ 7.) He opines that the light level captured in that video accurately reflects the light he observed on the two-year anniversary.

---

[3] Notably, Defendants removed these paragraphs from Dr. Monk's revised affidavit. (*See* Aff. of Chris Monk, Feb. 11, 2022 ("Revised Monk Aff.") [ECF No. 64-5].) Counsel clarified at oral argument that the Defendants did not withdraw those statements and that Dr. Monk is still offering those opinions.

(*Id.* ¶ 8.) But Dr. Monk does not offer any further information about how the team adjusted those light levels and, more importantly, none of that information was included in Dr. Monk's expert report, which was filed *before* the site visit. (*See* ECF No. 49-2.) Dr. Monk's expert report was filed on November 28, 2021, and this site visit did not occur until December 2, 2021. Defendants notably did not attempt to supplement Dr. Monk's report with an explanation of the adjustments the team made to the camera to capture the video footage taken on the two-year anniversary.[4] The manual adjustments required for the camera to accurately reflect the surrounding light levels fall outside of the common knowledge and experience of jurors, and Dr. Monk's affidavit does not provide any details regarding how the team made these adjustments. The other *Southern States* factors do not outweigh the prejudicial impact of this unfair surprise. *See* 318 F.3d at 596. Because this information was not disclosed in Dr. Monk's expert report and fails to provide the level of detail required, the court will grant Seamster's motion to strike this portion of the affidavit.

Defendants submitted a revised affidavit by Dr. Monk with their reply brief, offering seven paragraphs of new information and opinions addressing the video Seamster submitted of the crash site on the two-year anniversary. (*See* Revised Monk Aff. ¶¶ 9–15.) Dr. Monk states that Seamster's video "was recorded via a smartphone camera" which uses "Automatic Exposure" and "is not intended to show accurate levels of lighting, but is intended to adjust exposure levels to optimize the quality of the picture." (*Id.* ¶¶ 10–11, 13.) Because of the use

---

[4] Seamster has not moved to exclude Dr. Monk's video, only to strike these portions of his affidavit. At oral argument, counsel informed the court that they submitted the video to opposing counsel as a supplement to Defendant's discovery responses.

of Automatic Exposure, Dr. Monk opines that Seamster's video "does not accurately reflect the light conditions at the time of the incident." (*Id.* ¶¶ 14–15.)

Dr. Monk's opinions about the light levels in Seamster's video must be stricken. These opinions were not included in Dr. Monk's expert report and the information about automatic exposure is well outside of the realm of the common knowledge of a juror, such that an expert's testimony would be required and should be disclosed accordingly.[5]

Based on the above rulings, the court will consider only those opinions included in Black's and Dr. Monk's initial reports and the unstricken portions of their affidavits when ruling on Seamster's motion to exclude their expert testimony.

## B. Motion to Exclude Defendants' Liability Experts

Federal Rule of Evidence 702 and the Supreme Court's decisions in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999), govern the admissibility of expert testimony. The governing law "imposes a special gatekeeping obligation on the trial judge to ensure that an expert's testimony both rests on a *reliable* foundation and is *relevant* to the task at hand." *Sardis v. Overhead Door Corp.*, 10 F.4th 268, 281 (4th Cir. 2021) (emphasis in original) (cleaned up); *see Daubert*, 509 U.S. at 597. Because expert evidence can be particularly persuasive to a jury, "the importance of the gatekeeping

---

[5] Seamster also asserts that Dr. Monk made these opinions "without knowing anything about the camera [he] was using, whether it had default settings, whether they were in use, and without recognizing that [he] is the only person who knows whether the camera he was using, despite any of its assumed characteristics, did in fact capture the light conditions as they existed on December 2, 2019." (Pl.'s Br. Supp. Mot. Strike Revised Aff. at 6 [ECF No. 62].) The court finds these additional grounds support striking the portions of Dr. Monk's affidavit that critique Seamster's video and its representation of the light on the day of its recording. Dr. Monk's opinions in this regard are based on various assumptions; he does not know what type of camera Seamster used to take his video and he has not inspected it. *See S. States* 318 F.3d at 597 (explaining that district courts have broad discretion when ruling on Rule 37 motions).

function cannot be overstated." *Sardis*, 10 F.4th at 283 (quoting *United States v. Barton*, 909 F.3d 1323, 1331 (11th Cir. 2018)).

"The question of whether a witness is qualified to testify [as an expert] is context-driven and can only be determined by the nature of the opinion he offers." *RG Steel Sparrows Point, LLC v. Kinder Morgan Bulk Terminals, Inc.*, 609 F. App'x 731, 738 (4th Cir. 2015) (per curiam) (internal quotation marks omitted). To guide the court in its reliability determination, *Daubert* sets out four considerations: "(1) whether the expert's theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error inherent in the expert's theory or technique; and (4) whether the expert's methodology is generally accepted in his field of expertise." *Sardis*, 10 F.4th at 281 (internal quotation marks omitted). This is a "non-exhaustive" list of factors, and a district court enjoys "broad latitude to determine which of these factors (or some other unspecified factors) are reasonable measures of reliability in a particular case." *Id.* (internal quotation marks omitted). "[T]he relevance of [these] factors can 'depend on the nature of the issue, the expert's particular expertise, and the subject of his testimony.'" *Id.* (citing *Kumho Tire Co.*, 526 U.S. at 153).

At bottom, though, expert testimony is appropriate when the proffered witness is "qualified as an expert by knowledge, skill, experience, training, or education," the testimony "will help the trier of fact to understand the evidence or to determine a fact in issue," "the testimony is based on sufficient facts or data," "the testimony is the product of reliable principles and methods," and "the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. Ultimately, the court's objective is to ensure "that an

expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co.*, 526 U.S. at 152.

### 1. Tyler Black, M.S., P.E.

Seamster seeks to exclude Black's testimony, specifically as it pertains to the condition and effectiveness of the tractor's SMV emblem. In his report, Black states that the SMV emblem "was damaged in the collision." (ECF No. 49-1, at 16.) He includes for reference a photograph Seamster provided of the tractor some time prior to the crash with the SMV emblem visible and a photograph of the damaged SMV emblem post-accident:



(*Id.* at 49, 55.) Black states that the SMV emblem was "roughly 41 years" old and "had not been replaced since the tractor was purchased in or around 1978." (*Id.* at 16.) He also opines that "[t]he *nonreflective* fluorescent interior portion of the emblem exhibited significant loss of paint due to age." (*Id.* (emphasis added).) But Black does not offer his own opinion about the condition of the *reflective* portion of the SMV emblem. (*See id.* at 16–17.) Rather, he critiques Seamster's liability expert, James Whelan's, failure to test the SMV emblem. (*Id.* ("No testing was conducted to quantify visibility of the 41-year-old SMV emblem on the rear of the John

Deere . . . .").) Black ultimately concludes that "the effectiveness of the SMV emblem is certainly diminished from when it was originally manufactured." (*Id.* at 17.)

Seamster moves to exclude this testimony on the grounds that (1) Black assumed the SMV emblem was 41 years old without sufficient evidence in the record to support that assumption; and that (2) Black did not conduct any tests on the SMV emblem himself or offer an opinion on the reflective portion of the emblem. (*See* Pl.'s Br. Supp. Mot. Exclude at 5–8 [ECF No. 32].) The court will grant Seamster's motion to exclude this testimony under *Daubert* because Black's opinions do not rest on reliable facts and data and are not the result of reliable principles and methods.

The court first notes that Black's assumption that the SMV emblem was 41 years old is valid based on the record. The tractor was purchased around 1978 (Seamster Dep. at 49:9–17), and Seamster testified that he had never replaced the SMV emblem (*id.* at 58:4–6). But he also testified that the tractor belonged to his father until 2015 or 2016, when Seamster took possession of it. (*Id.* at 49:18–50:8.) Seamster asserts that this testimony, at most, supports an inference that Seamster did not replace the SMV emblem between 2015 and the date of the crash. (*See* Pl.'s Br. Supp. Mot. Exclude at 6.) Faced with only this evidence—and no evidence that the SMV emblem had ever been replaced—the court finds it reasonable for Black to assume that the SMV emblem was 41 years old—an opinion and assumption that would certainly be open to cross examination.

But Black's testimony cannot pass muster insofar as he opines about the condition of the SMV emblem at the time of the crash. Black concludes that the nonreflective portion of the SMV emblem "exhibited significant loss of paint due to age" but, as Seamster points out,

Black does not address or consider whether any of the observed paint loss was due to the SMV emblem fracturing in the accident as opposed to its age. (*See* ECF No. 49-1, at 16.) Furthermore, Black does not offer his own opinion as to the quality of the reflective material on the SMV emblem. He did not conduct any testing of his own on any portion of the SMV emblem—reflective or nonreflective. Black critiqued Whelan's opinion as to the condition of the reflective portion of the SMV emblem as lacking a scientific foundation, but then offers his own opinion—based solely on the assumed age of the SMV emblem—that the effectiveness of the emblem was "certainly diminished." (*See id.* at 17.)

The court finds that Black's own failure to test any portion of the SMV emblem renders these opinions inadmissible as expert testimony. Black does not base these opinions on any type of reliable principles or methods, only his observations of the photograph of the SMV emblem and its assumed age. Black's flawed methodology and "failure to adequately address alternative theories undermine the reliability of [his] opinion." *Cady v. Ride-Away Handicap Equip. Co.*, 702 F. App'x 120, 127 (4th Cir. 2017). Black does not offer an opinion on the SMV emblem that jurors could not reach on their own without the assistance of expert testimony. *See Smithers v. C & G Custom Module Hauling*, 172 F. Supp. 2d 765, 772–73 (E.D. Va. 2000) (granting motion to exclude expert testimony where it was so unreliable as to render the testimony "unlikely to assist the fact[-]finder in any meaningful way"). The court will therefore grant Seamster's motion to exclude this portion of Black's testimony.

## 2. **Dr. Chris Monk**

Dr. Monk, Defendants' expert in human factors, offers various opinions regarding Defendant Taylor's PRT and the "looming threshold" during this accident. According to Dr.

Monk, PRT represents the time it takes for a driver to "perceiv[e] an obstacle or object in the vehicle's path and produc[e] an appropriate response to avoid a collision." (ECF No. 32-2, at 11.) The looming threshold is "[t]he earliest point at which a viewer can use [the relative size of a lead vehicle's projection onto the retina] to make accurate speed and distance judgments." (*Id.* at 12.) Seamster moves to exclude this testimony in its entirety on multiple grounds.

First, Seamster argues that Dr. Monk failed to consider the presence of an SMV emblem on the tractor and the effect that would have on PRT. This mischaracterizes Dr. Monk's report. Dr. Monk addresses the presence of the SMV emblem, but ultimately concludes that it would not affect PRT. (*See id.* at 4, 15–16.) Specifically, Dr. Monk opines that "[a] single light or SMV emblem is much smaller than the width of the [tractor's] warning lights and therefore would result in a looming distance much closer to the object or vehicle ahead." (*Id.* at 16.) In other words, Dr. Monk has determined that the tractor's warning lights, as opposed to the SMV emblem, would provide the basis for an oncoming driver to assess the tractor's looming distance. (*See id.* at 15–16 ("In low light conditions, vehicle size is typically gauged by pairs of rear-facing lights such as taillights or warning lights, the latter of which I used in my looming distance calculations.").)

Seamster argues that Dr. Monk did not address the fact that, as his expert Whelan opined, "a functioning SMV emblem unambiguously tells approaching drivers they are approaching a slow-moving vehicle without the need to experience looming." (ECF No. 34-2, at 20.) But Dr. Monk instead relies on "scientific evidence that drivers rely on . . . the looming threshold[] to determine the need to take action when approaching a slow moving or stationary vehicle ahead." (ECF No. 32-2, at 16.) Dr. Monk's report clearly demonstrates that

he considered the effect of the SMV emblem, but ultimately reached different conclusions than Whelan. This reasoned difference of opinion does not warrant exclusion, but is a proper subject for cross-examination. Because Dr. Monk did not ignore a relevant piece of evidence in forming his expert opinion, the court will not exclude his testimony on this ground.

Seamster also moves to exclude Dr. Monk's testimony on the basis that he applied a 2.5 second PRT when Virginia law establishes an "average driver [PRT]" of 1.5 seconds. *See* Va. Code Ann. § 46.2-880. But this code section merely provides the average driver PRT and does not require that a court apply that time to every single accident, regardless of circumstances. *See id.* (providing that the table of values "shall not raise a presumption" and allowing "site-specific research [to] be utilized under any circumstances"). To support adopting a 2.5-second PRT, Dr. Monk provided two justifications: (1) Black's opinion that the tractor's taillights were not functioning at the time of the accident; and (2) the "low[-]light conditions" at the time of the accident. (ECF No. 32-2, at 14.) Dr. Monk stated that the 2.5-second PRT comes from scientific literature and is recommended by the American Association of State Highway and Transportation Officials as "the 95th percentile PRT for reacting to an unexpected event at night." (*Id.*) The court is satisfied that these explanations support Dr. Monk's stated PRT and render his opinions the product of reliable facts, data, and principles. Seamster is free to cross-examine Dr. Monk on both his conclusions about the effect of the SMV emblem and his deviation from Virginia's default 1.5-second PRT, but the court finds no valid basis to exclude this expert testimony. The court will therefore deny Seamster's motion to exclude Dr. Monk.

### C. Motion to Exclude Seamster's Liability Expert: James Whelan, P.E.

Defendants move to dismiss the testimony of Seamster's liability expert, James Whelan. The *Daubert* principles discussed above apply equally to Whelan's report and testimony. Defendants challenge Whelan's conclusions as to the condition of three parts of the tractor at the time of the collision: (1) the taillights, (2) the right front headlight, and (3) the SMV emblem. Defendants contend that Whelan's opinions as to each of these features are not based on reliable principles and methods of testing. Defendants also ask the court to use its discretion to exclude the entirety of Whelan's expert testimony because, in the Defendants' view, Whelan applied different principles and methods in the separate and unrelated case of *Pakhnyuk v. Orellano. see* Decl. of James D. Whelan, *Pakhnyuk v. Orellano*, No. 5:18-cv-00003, at ECF No. 46-3 (W.D. Va. Oct. 18, 2018), *available at* 2018 WL 8664349. The court will address each argument in turn.

Defendants first ask the court to exclude Whelan's testimony that the taillights were on at the time of the accident. Defendants argue that Whelan's opinion on this matter "blatantly ignore[s] the physical evidence" to the contrary and that the testing conducted by Whelan to support his opinions is "fundamentally flawed." (*See* Defs.' Reply at 1–11 [ECF No. 59].) Experts for both sides examined the filaments of the tractor's right rear taillight that was recovered from the scene of the accident. The filaments exhibited signs of "cold shock" because they were fractured into several smaller pieces that, as previously discussed with Black's testimony above, suggest that the taillight was off at the time of impact. (*See* ECF No. 34-1, at 65.) Whelan acknowledges as much in his report and in his deposition. (*See id.*; Dep. of James Whelan 106:7–15, Jan. 4, 2022 [ECF No. 34-3] ("The right tail or running light would

indicate that it was off at impact, that's correct.").) But Whelan notes that the physical evidence is "inconsistent with" the statements of witnesses to the accident—namely Seamster who testified that the lights were on and a police officer at the scene who noted that the light switch was turned to the position that would turn on the taillights. (*See* ECF No. 34-1, at 65.) Importantly, Seamster did not actually observe the taillights on prior to the accident. (*See* Seamster Dep. at 84:21–85:4.)

From this evidence, Whelan hypothesized that the taillights in this case were exposed to two impacts, the first when the tractor-trailer initially collided with Seamster's tractor and the second when the portion of the tractor that contained the taillights struck the ground. So Whelan set out to test whether taillights that were illuminated during the first impact could subsequently lose power and cool to a level where, by the time of the second impact, they would experience cold shock. Whelan referred to this as "proof-of-concept testing." (*See* ECF No. 34-1, at 66.) To conduct his test, Whelan aged light bulbs to resemble the condition of the tractor's lightbulbs. (*Id.*) Then he energized the bulbs for a period of time, removed the energy source, and taped the bulb to a weighted hammer to strike against a steel docking plate. (*Id.*) The below images come from Whelan's report demonstrating this testing method:



(*Id.* at 68–69.) From this test, Whelan concluded that a bulb, which was on, can be deenergized for 2.6 seconds and then exhibit cold shock after an impact. (*Id.* at 66.) Critically absent from Whelan's proof-of-concept test is a simulation of an *initial* impact sufficiently powerful to cause the lightbulb to lose power but not so forceful that the bulb experiences hot or cold shock. (*See id.* at 65–69.) Defendants move to exclude Whelan's testimony as to the illumination status of the taillights, arguing that his proof-of-concept test is not the product of reliable principles and methods of testing. The court agrees.

The question of "how an object will perform when subjected to certain forces" is "scientific in nature" and raises "basic, testable engineering concepts . . . ." *See Sardis*, 10 F.4th at 291. "Testing is a key component of the *Daubert* inquiry, and the failure to properly test a hypothesis is often grounds for excluding expert testimony." *Case v. Geek Squad Subsidiary Best Buy Stores, L.P.*, 823 F. Supp. 2d 334, 346 (D. Md. 2011) (internal quotation omitted). To be admissible, the expert's test must "meaningfully approximate the conditions" at issue. *Evans v. Medtronic, Inc.*, No. 3:04-cv-00097, 2005 WL 3547240, at *10 (W.D. Va. Dec. 27, 2005). While these principles do not "require experimental exactitude[,]" a test that does not adequately replicate the forces present during an accident is unreliable and must be excluded. *Id.* at *12; *see also Nease v. Ford Motor Co.*, 848 F.3d 219, 231–33 (4th Cir. 2017) (reversing denial of motion to exclude expert testimony when the expert presented a hypothesis but failed to validate that hypothesis with testing).

The court finds that Whelan's proof-of-concept test did not "meaningfully approximate the conditions" at issue and failed to properly test his own hypothesis. *See Evans*, 2005 WL 3547240, at *10. Whelan theorizes that the bulbs were subject to two impacts, which

would explain why the lightbulbs exhibited signs of cold shock but were nonetheless on at the time of the accident. According to this theory, the first impact cut off the energy source to the bulb, allowing the filaments to cool to an appropriate temperature to exhibit signs of cold shock upon the second impact. But Whelan's method of testing does not account for the first impact. He does not even attempt to test the effect of an initial impact on the status of the bulb filaments. (*See* Whelan Dep. at 92:11–93:3 (responding that testing the initial impact "would be difficult to do").) In short, Whelan attempts to prove his two-impact theory with a proof-of-concept test that confirms only half of the theory. This is insufficient as a matter of law, and the court cannot allow him to present this test to the jury.

The Fourth Circuit has recognized "that due to the difficulty of evaluating their testimony, expert witnesses have the potential to 'be both powerful and quite misleading.'" *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001) (quoting *Daubert*, 509 U.S. at 595). "The main purpose of *Daubert* exclusion is to protect juries from being swayed by dubious scientific testimony." *Nease*, 848 F.3d at 231. Whelan's proof-of-concept test is the kind of unreliable scientific testimony that underscores the court's important role as a gatekeeper of expert testimony. The court will therefore grant Defendants' motion as it relates to Whelan's testimony about the illumination status of the taillights.

Second, Defendants move to exclude Whelan's testimony that no conclusions can be drawn about the illumination status of the right front headlight at the time of the accident. Defendants' liability expert, Black, offered the opinion that the right front headlight was on at the time of the accident, because it had exhibited signs of hot shock. (ECF No. 49-1, at 14.) And he explains that if a lit bulb further from the area of impact exhibits signs of hot shock,

one would expect a lit bulb closer to the area of impact to also exhibit signs of hot shock. (Black Aff. ¶¶ 8–9.) Black offers this evidence in support of his opinion that the right taillight was off at the time of the crash.

In support of their motion, Defendants argue that Whelan never personally observed the right front headlight bulb filaments and cannot offer an opinion about what those filaments show. Seamster counters that lightbulb filaments are only "analyzed through observation" and that he received an adequate picture of the bulb filaments that allowed him to form an opinion without acquiring the actual lightbulb. (*See* Pl.'s Br. Opp'n Mot. Exclude at 15 [ECF No. 47].) The picture Seamster received is below:



(ECF No. 49-1, at 36.) Whelan's failure to physically examine the filament may be fertile grounds for cross-examination but, given that experts do not typically conduct physical testing on filaments to reach their conclusions, the court cannot conclude that a photographic examination falls so outside the norm of accepted practices that it must be excluded. The court will deny Defendants' motion as to this opinion.

Third, Defendants ask the court to exclude Whelan's opinion that the reflective material on the tractor's SMV emblem "looked good." (*See* Defs.' Br. Supp. Mot. Exclude, at 17 [ECF No. 34] (quoting ECF No. 34-1, at 29–30).) Defendants assert that the effectiveness of this reflective material is capable of being tested and that Whelan's reliance "upon simple visual observation" is an insufficient basis for expert testimony. (*Id.*) Whelan admits that the reflectivity of the SMV emblem could have been tested. (*See* Whelan Dep. at 68:12–71:12 ("I could have tested the remnants of this emblem, that's correct.").) "Without testing, supporting literature in the pertinent field, peer reviewed publications[,] or some basis to assess the level of reliability, expert opinion testimony can easily, but improperly, devolve into nothing more than proclaiming an opinion is true 'because I say so.'" *Small v. WellDyne, Inc.*, 927 F.3d 169, 177 (4th Cir. 2019). The court finds that Whelan's failure to test the reflective material in this case renders his opinion that the material "looked good" unreliable and ultimately unhelpful to a jury. Whelan's opinion on the condition of the SMV emblem does not provide any information that jurors cannot assess for themselves by viewing the photograph depicting the remnants of the emblem. The court will grant Defendants' motion to exclude this portion of Whelan's testimony.[6]

Finally, the court will not exclude Whelan's testimony based on his prior expert testimony in *Pakhnyuk v. Orellano*. Defendants observe that in *Pakhnyuk*, Whelan "found it critical to apply the Visual Expansion Rate ("VER") and Perception-Response Time ("PRT")

---

[6] Whelan also testified that the 1968 standard for visibility of a SMV emblem required that such emblems be visible from 600 feet away. (*See* ECF No. 34-1, at 54–55.) Whelan offers that this was the applicable standard for SMV emblems at the time the tractor was manufactured. (*See id.*) Whelan may testify about this standard and Defendants may cross-examine him about whether he conducted any testing to show that the actual emblem held up to these standards.

to his accident[-]avoidance analysis," but Whelan did not apply those measures here.[7] (*See* Defs.' Reply at 24.) But Seamster has highlighted several key factual differences between the two cases—namely that the accident in *Pakhnyuk* involved a "Toyota truck hauling an ATV being towed by a school bus," occurred on an interstate at 9:45 p.m., and the vehicle did not carry an SMV emblem. (*See* Pl.'s Br. Opp'n Mot. Exclude at 19.) In addition to those differences, Seamster argues that "inconsistencies in testimony go to its weight, not its admissibility, and are not a basis for excluding [an] expert from testifying at trial." (*Id.* at 20 (quoting *McIntosh v. Monsanto Co.*, 462 F. Supp. 2d 1025, 1032–33 (E.D. Mo. 2006).) The court agrees with this assessment and finds that Whelan's expert opinion in *Pakhnyuk* does not cast sufficient doubt on the reliability of the otherwise admissible portions of his report in this case as to exclude those opinions. Whelan's different approach in each case is a proper subject of cross-examination, not grounds for excluding his testimony altogether.

The court therefore will grant Defendants' motion to exclude Whelan's testimony insofar as he opines through his "proof-of-concept" testing that the taillights were on at the time of the collision and insofar as Whelan offers any opinion on the condition of the SMV emblem at the time of the accident. The court will deny the motion as to Whelan's testimony concerning whether the right headlight was on at the time of the collision.

These rulings substantially narrow the scope of expert opinions that Whelan will be permitted to offer, but they do not warrant the complete exclusion of his testimony. Whelan, for example, will be able to offer opinions like, "a functioning SMV emblem unambiguously

---

[7] In *Pakhnyuk*, Whelan opined that the driver "did not have enough time to avoid the collision." (ECF No. 34-6, at 28.) He reached this conclusion, in part, by applying VER and PRT concepts. (*See id.* at 25–28.) In contrast, Whelan has not applied either concept to this case and reached the opposite conclusion.

tells approaching drivers they are approaching a slow-moving vehicle without the need to experience looming." (ECF No. 34-2, at 20.) And he may opine that the right headlight filament does not exhibit hot shock. But Whelan will not be able to opine that Taylor "had enough time" and "ample opportunity" to avoid the collision, insofar as the foundation for that opinion is premised, in large part, on his specious findings regarding the condition of the taillights and the SMV emblem at the time of the accident. (*See* ECF No. 34-1, at 80.) The court will not exclude Whelan's testimony in its entirety based on his prior testimony in *Pakhnyuk* or based on any other concerns about the reliability of opinions not already excluded above.

### D. Motion to Exclude Seamster's Medical Expert Dr. William Silver

### 1. Background

Defendants moved to exclude the testimony of Dr. William Silver (ECF No. 35), asserting that Seamster's disclosure under Federal Rule of Civil Procedure 26(a)(2)(C) was deficient. On September 20, 2021, Seamster designated Dr. Silver as a hybrid witness—to offer both fact and expert testimony—under Rule 26(a)(2)(C).[8] (*See* ECF No. 36-1, at 3.). In his disclosure, Seamster stated that his "treating health care providers,"[9] including Dr. Silver, will testify to:

> diagnoses, signs and symptoms, observations, evaluations, histories, treatment plans, and permanency ratings (right upper extremity: 24%; whole person: 14%) obtained or formulated as documented in the course of their treatment of Plaintiff along with the facts communicated to, or otherwise learned by them in

---

[8] The parties agree that Dr. Silver is not an expert witness under Rule 26(a)(2)(B) and therefore is exempted from filing a full expert report that complies with that rule. (*See* ECF No. 36-1, at 3; Defs.' Br. Supp. Mot. Exclude at 5 [ECF No. 36].)

[9] Seamster included a list of seven treating health care providers in this disclosure. (*See* ECF No. 36-1, at 3.)

> connection with their attendance, examination[,] and treatment
> of [Seamster]. These treating health care providers are expected
> to testify in accordance with their medical records, expenses, and
> imaging studies (ordered or interpreted). See the medical records,
> expenses, and imaging studies of [Seamster's] treating health care
> providers for more information as to their expected testimony,
> all of which are incorporated by reference.

(*Id.*) Defendants argue that this disclosure is deficient because it does not state the specific facts and opinions to which Dr. Silver will testify. Specifically, Defendants note that this disclosure does not state that Dr. Silver will testify regarding the cause of Seamster's shoulder injury. Because of this deficient disclosure—and the contradictory statements contained in Dr. Silver's contemporaneously recorded medical records—Defendants contend that Dr. Silver should not be allowed to offer an expert opinion that the accident caused Seamster's shoulder injuries. Moreover, without an expert to opine as to the cause of Seamster's shoulder injuries, Defendants assert that Dr. Silver's factual testimony regarding the treatment he provided should be excluded as irrelevant. For the reasons that follow, the court will grant in part and deny in part Defendants' motion to exclude Dr. Silver.

On January 28, 2020, Seamster sought treatment from Dr. Silver. (ECF No. 36-3, at 1.) His chief complaint was "bilateral shoulder pain." (*Id.* at 2.) Dr. Silver documented the history of Seamster's injuries and stated in his medical records that, "He was rear-ended by a tractor trailer. He was bruised . . . . I am uncertain of what other treatment he has had other than an MRI scan of the left shoulder on 12/19/2019 . . . ." (*Id.*) In his treatment plan, Dr. Silver documented, "The patient is 7 weeks out from his injury and continues to have pain." (*Id.* at 3.) On February 13, Seamster had an appointment to discuss his MRI results and Dr. Silver

documented that the Plaintiff "was in a motor vehicle accident on 12/02/2019." (*See* ECF No. 36-4, at 1–2.)

On November 25, Seamster had a pre-operative appointment in advance of his upcoming shoulder surgery. (ECF No. 36-5, at 1.) Dr. Silver's records of this appointment do not reference the accident or the cause of Seamster's injuries. (*Id.*) Five days later Seamster had surgery on his right shoulder. (ECF No. 36-6, at 2.) In the operative report, Dr. Silver referred to Seamster's shoulder injury as a "chronic condition" that "has been present for several years . . . ." (*Id.*) Dr. Silver does not reference Seamster's accident or opine as to the cause of his shoulder injuries in that operative report, in the medical records following Seamster's post-operative appointment two weeks later, or in records accompanying his four follow-up appointments over the next year. (*See id.*; ECF Nos. 36-7, 36-8, 36-9, 36-10.)

Defendants took Dr. Silver's deposition on January 4, 2022, three days before the close of discovery in this case. (*See* Dep. of Dr. William Silver, Jan. 4, 2022 [ECF No. 36-12]; ECF No. 12.) Dr. Silver testified that Seamster complained of shoulder pain at his initial visit. (Silver Dep. at 7:1–6.) Dr. Silver stated, "I have recorded in my notes on January 28th of 2020 that he was involved in a motor vehicle collision on. . . 12/2/2019." (*Id.* at 8:25–9:4.) When asked whether he formed an opinion about the cause of Seamster's shoulder injury by his second visit in February 2020, Dr. Silver responded, "Based on lack of further information from the patient, I assumed that it was from his motor vehicle collision just based on what he told me." (*Id.* at 9:20–10:6.) Dr. Silver testified that "it seems likely that [Seamster's shoulder injury] was

the result of a high [impact[10]] type of injury, not something that would occur from day-to-day activities . . . . Typically, a single impact type of injury." (*Id.* at 11:1–9.) When asked if the surgery he provided to Seamster was "causally related to the December 2nd, 2019, crash," Dr. Silver responded, "Yes." (*Id.* at 15:25–16:6.) Dr. Silver also testified that his operative report contained a "scrivener's error" and that his notes should have stated that Seamster's injury had been present for "several months," not "several years." (*Id.* 15:16–24.)

But when pressed about whether his medical records for Seamster state that he sustained his shoulder injury in the accident, Dr. Silver conceded, "I do note that he had the accident in the tractor trailer injury. I did not stipulate anywhere that I can see in my note that the shoulder injury occurred specifically from that [accident]." (*Id.* at 21:24–22:4; *see also id.* at 22:9–12 ("I did not document that. I did document that he had an accident. I did not go further and take the next step and document that it was a result of his accident.").)

Seamster also received care from Dr. Gregory O'Shanick, a psychiatrist and neurologist who has been designated as an expert witness in this case under Rule 26(a)(2)(B). (*See* ECF No. 36-1, at 2; ECF No. 51-4, at 40.) Under the subheading "Review of Records," Dr. O'Shanick's report summarizes Seamster's post-accident medical appointments with other health care professionals, including the appointments related to his shoulder injuries. (ECF No. 51-4, at 7–12.) His report also lists "Right shoulder SLAP injury" under the "Current Diagnoses" heading. (*Id.* at 22.) But, aside from those remarks, Dr. O'Shanick's report does

---

[10] Dr. Silver's deposition refers to a "high injury type of injury," but, given the context surrounding this statement, the court assumes he meant to say "impact." (*See id.* at 11:1–9.)

not discuss Seamster's shoulder injuries or offer an opinion on the underlying cause of those injuries. (*See id.* at 20–29.)

### 2. Analysis

"As they are not typically retained or specially employed to provide expert testimony, treating physicians are not ordinarily required to file Rule 26(a)(2)(B) expert reports . . . . However, a party seeking to introduce treating physician testimony should generally comply with Rule 26(a)(2)(C)." *See Kristensen v. Spotnitz*, No. 3:09-CV-00084, 2011 WL 5320686, at *1 (W.D. Va. June 3, 2011) (internal quotations and citations omitted). Disclosures under Rule 26(a)(2)(C) "must state: (i) the subject matter on which the witness is expected to present evidence under Federal Rule of Evidence 702, 703, or 705; and (ii) a summary of the facts and opinions to which the witness is expected to testify." Fed. R. Civ. P. 26(a)(2)(C). "A mere statement of the topics of the [witness's] opinions is insufficient." *Marr*, 2015 WL 3827326 at *5.

"If a treating physician forms an opinion of the causation of an injury to a patient and the prognosis of the patient's condition during the treatment then such opinion may be expressed by the treating physician without the necessity of a report under Fed. R. Civ. P. 26(a)(2)(B)." *Hall v. Sykes*, 164 F.R.D. 46, 48 (E.D. Va. 1995). Accordingly, "a physician is exempt from this written report requirement only as to opinions formed during the course of treatment." *Morris v. Bland*, 666 F. App'x 233, 239 (4th Cir. 2016) (per curiam).

Seamster argues that he sufficiently disclosed Dr. Silver's opinions as to causation in his Rule 26(a)(2)(C) disclosure. (Pl.'s Br. Opp'n Mot. Exclude at 1 [ECF No. 51].) But Seamster's disclosure does not state the specific facts and opinions to which Dr. Silver will

testify. (*See* ECF No. 36-1, at 3.) It only generally states the *topics* of Dr. Silver's testimony: "diagnoses, signs and symptoms, observations, evaluations, histories, treatment plans, and permanency ratings . . . along with the facts communicated to, or otherwise learned by them in connection with their . . . treatment of [Seamster]." *Id.* This type of disclosure is insufficient under Rule 26(a)(2)(C). *See Marr*, 2015 WL 3827326, at *4–5; *cf. Beard v. Town of Topsail Beach*, 2020 WL 1539924, at *6 (E.D.N.C. Mar. 31, 2020) (finding plaintiff's disclosures under Rule 26(a)(2)(C) sufficient when, "[f]or each of plaintiff's physicians and therapist, plaintiff provide[d] a summary of their qualifications, followed by a paragraph outlining the facts and opinions to which each is expected to testify") (internal quotations omitted).

Perhaps recognizing the deficiency of this disclosure on its own, Seamster contends that he "properly identified the topics of Dr Silver's testimony through his Rule 26(a)(1) initial disclosures, his discovery responses, and his Rule 26(a)(2) disclosures." (Pl.'s Br. Opp'n Mot. Exclude at 1.) Seamster asserts that he "properly provided a summary of Dr. Silver's records and opinions via his Rule 26(a)(2) disclosures, including Dr. O'Shanick's summary of Dr. Silver's records in his Rule 26(a)(2)(B) report," and that Defendants designated and disclosed their own summary of Dr. Silver's records in their competing expert's Rule 26(a)(2)(B) report. (*Id.*) In Seamster's view, these statements, combined, satisfy Rule 26(a)(2)(C)'s requirements. (*Id.*)

Rule 26(a)(2)(C) does not "allow[] a party to make an expert witness disclosure in this kind of a Rube Goldberg-like fashion." *See Sec. & Exch. Comm'n v. Nutmeg Grp., LLC*, No. 09 C 1775, 2017 WL 4925503, at *4 (N.D. Ill. Oct. 31, 2017). Furthermore, while Seamster's Rule 26(a)(1) initial disclosures include causation among the list of things to which Dr. Silver will

testify (*see* ECF No. 51-1, at 5), the only direct statement connecting Seamster's shoulder injuries to his accident come from Defendants' expert witness's report (ECF No. 51-5, at 2 (noting that at a December 13, 2019 doctor's appointment "Seamster complain[ed] of bilateral shoulder pain following [a motor vehicle accident]")).

Disclosures under Rule 26(a)(2)(C) must include at least "a summary of the facts and opinions" composing a hybrid witness's testimony, and Seamster's disclosure of Dr. Silver's opinion testimony falls short. Rule 37(c) therefore prohibits Seamster's use of this testimony "unless the failure was substantially justified or is harmless." Here again, the court must weigh the *Southern States* factors. *See* 318 F.3d at 596. "The court need not consider every *Southern States* factor, and the court is afforded 'particularly wide latitude to [use its] discretion to issue sanctions under Rule 37(c)(1).'" *Marr*, 2015 WL 3827326, at *6 (quoting *Wilkins*, 751 F.3d at 220–21). The balance of the factors weighs in favor of excluding Dr. Silver's opinion testimony as to the cause of Seamster's shoulder injury.

First, the surprise to Defendants regarding Dr. Silver's opinion testimony supports exclusion. Seamster's disclosure of Dr. Silver as a hybrid witness does not state that he will opine on causation. (*See* ECF No. 36-1, at 3.) Moreover, the disclosure states that "[Dr. Silver is] expected to testify in accordance with [his] medical records . . . ." (*Id.*) In those records, Dr. Silver writes that Seamster scheduled an appointment "for evaluation of bilateral shoulder pain." (ECF No. 36-3, at 2.) It notes that he was injured in a motor vehicle collision about two months prior. (*See id.*) He does not, however, opine that the crash caused the shoulder injuries for which Seamster sought treatment. In fact, Dr. Silver's operative report completed about a year after the accident refers to Seamster's right shoulder injury as a "chronic condition" that

"has been present for several years . . . ." (ECF No. 36-6, at 2.) It is true that Dr. Silver later clarified in his deposition that this record contained a scrivener's error and should have read "several months," but that deposition was not taken until January 4—just three days before discovery closed. (*See* Silver Dep. at 15:16–24.)

Defendants' first exposure to an affirmative statement by Dr. Silver that the crash caused the injury to Seamster's shoulder was also in that deposition. (*See* Silver Dep. at 11:1–9, 15:25–16:6.) Dr. Silver testified that, in his initial evaluation, he "assumed that [Seamster's shoulder injury] was from his motor vehicle collision" based on "what [Seamster] told me." (*Id.* at 10:3–6.) He admits that while he did document the fact of Seamster's accident, he "did not go further and take the next step and document that it was a result of his accident." (*Id.* at 22:9–12.) Dr. Silver's deposition testimony stands in conflict with his statement in his operative report that Seamster's right shoulder injury was a "chronic condition." (ECF No. 36-6, at 2.) The first factor therefore weighs in favor of exclusion because Defendants were surprised by Dr. Silver's conflicting statements and the lack of other statements in his medical records opining on the cause of Seamster's shoulder injuries.

Second, Defendants' limited ability to cure the surprise weighs in favor of exclusion. Defendants only became aware of Dr. Silver's opinion testimony that the crash caused Seamster's shoulder injury three days before discovery closed. This late disclosure did not provide sufficient time for Defendants to retain a rebuttal expert, submit a supplemental expert report, or provide other information to counter Dr. Silver's opinion testimony as to causation. *See Jamison v. Amonette*, No. 7:18-cv-00504, 2022 WL 326095, at *6 (W.D. Va. Feb. 3, 2022) (holding that expert disclosure six weeks prior to trial would require the court to re-

open discovery to allow the defendants to cure the surprise, resulting in prejudice to the defendants); *cf. Marr*, 2015 WL 3827326 at *6 (holding that disclosure one month prior to the close of discovery allotted sufficient time for the defendants to cure surprise); *Keralink Int'l, Inc. v. Stradis Healthcare, LLC*, No. CCB-18-2013, 2021 WL 1198150, at *3 (D. Md. Mar. 30, 2021) (holding that a party had sufficient time to cure surprise when "there were several weeks of discovery remaining"); *Kristensen*, 2011 WL 5320686, at *3 (holding that the plaintiffs' supplemental disclosure filed a full week before the defendants' expert disclosures were due and "well before the close of discovery or the anticipated start of trail" allowed ample opportunity to cure any surprise).

Third, the potential for any opportunity to cure to disrupt trial also favors the exclusion of Dr. Silver's opinion testimony. While trial in this case is not scheduled to begin until October 24, 2022, at the time of Dr. Silver's deposition, trial was set to begin in about two months and dispositive motions were due in a few weeks. Extending discovery under these circumstances to allow adequate time for Defendants to cure any surprise might require an extension of the deadline for dispositive motions and, ultimately, a second continuance of trial. *See Jones v. Chapman*, No. ELH-14-2627, 2017 WL 2266221, at *6–7 (D. Md. May 24, 2017) (excluding under *Southern States* an untimely expert report that was eventually produced two weeks before the deadline for summary judgment motions and seven months before trial); *see also Jamison*, 2022 WL 326095, at *6 (excluding untimely expert report under *Southern States* when the court did not yet have a firm trial date); *Sanchez Carrera v. EMD Sales, Inc.*, 402 F. Supp. 3d 128, at 138–39 (D. Md. 2019) (same).

Fourth, Seamster's explanation for his failure to properly disclose Dr. Silver's opinion testimony is essentially that he believed the Rule 26(a)(2)(C) disclosure was sufficient. But even a "genuine and clear lack of understanding of the requirements of Rule 26(a)(2)(C)," cannot outweigh the balance of the other factors. *See Keralink*, 2021 WL 1198150, at *4.

Fifth, Dr. Silver's causation testimony is not so important as to compel inclusion. While excluding Dr. Silver's expert testimony as to the cause of Seamster's shoulder injury may factor into the ultimate calculation of damages in this case, it would not prove dispositive of any summary judgment motion or render him without proof of other damages arising from this accident. (*See, e.g.*, ECF No. 51-4 (Dr. O'Shanick's expert report evaluating Seamster's neurological injuries).) On balance, the *Southern States* factors weigh in favor of excluding Dr. Silver's expert testimony as to his opinion regarding the cause of Seamster's shoulder injury. *See* 318 F.3d at 596.

Seamster's arguments against excluding Dr. Silver's causation testimony closely resemble the plaintiff's arguments in *Vanderberg v. Petco Animal Supplies Stores, Inc.*, where the court also granted the defendant's motion to exclude improperly disclosed expert testimony by a treating physician. *See* 906 F.3d 698, 702–07 (8th Cir. 2018). In *Vanderberg*, the plaintiff included the name of his treating physician in his initial disclosures and stated: "See medical records for specific treatments and examinations." *Id.* at 700. In those medical records, the physician "recounted a brief summary of the incident [where plaintiff was allegedly injured] before describing [the plaintiff's] injuries and his treatments." *Id.* In a letter sent after the deadline to disclose expert witnesses, plaintiff's counsel stated: "We expect the treating

physicians and surgeons will testify as to their diagnosis, treatment, prognosis, functional impairment[,] and future medical care . . . ." *Id.* at 701.

The district court found that these disclosures were insufficient under Rule 26(a)(2) and excluded the treating physician's causation testimony. *Id.* In upholding the district court, the Eighth Circuit rejected the plaintiff's arguments that "his production of hundreds of pages of medical records, which included operative notes and a letter by [the treating physician], provided ample notice to [the defendant] that [the treating physician] would express causation opinions." *Id.* at 703 (internal quotation marks omitted). The court noted that the plaintiff's production of hundreds of pages of medical records did not constitute a disclosure summarizing the opinions the treating physician was expected to offer, as required under Rule 26(a)(2)(C).[11] *Id.* The court then considered whether the failure to properly disclose this testimony was "substantially justified or harmless."[12] *Id.* at 704. The court rejected the plaintiff's contention that the defendant "should have figured out" that his treating physician would offer expert testimony on causation. *Id.* "The expert witness disclosure requirements would be rendered meaningless if a party could ignore them and then claim that the nondisclosure was harmless because the other party should have read between the lines." *Id.*

---

[11] In *Vanderberg*, the plaintiff's disclosure was also found insufficient because the treating physician was only noticed as a fact witness, not a hybrid witness like Dr. Silver. *See id.* at 701–03. The Eighth Circuit rested its holding on two independently sufficient holdings: that deficiency and the plaintiff's failure to properly disclose the opinions the treating physician would offer. *Id.* at 703. Although Seamster noticed Dr. Silver as a hybrid witness, the insufficient disclosure of his causation expert testimony resembles the treating physician's in *Vanderberg. See id.*

[12] While the Eighth Circuit does not apply the *Southern States* factors, this court's analysis of when a failure to disclose is substantially justified or harmless under Rule 37(c)(1) remains instructive.

As it relates to Dr. Silver's testimony, the court will extend the cogent analysis of *Vanderberg* and exclude the improperly disclosed testimony. Seamster, in sum, has not substantially justified the late disclosure or established its harmlessness.

Defendants next argue that, if the court excludes Dr. Silver's opinion testimony as to the cause of Seamster's shoulder injury, "there is no further admissible evidence that provides the necessary causal link between the subject collision and Dr. Silver's treatment" of the injuries. (Defs.' Reply at 10 [ECF No. 58].) And without this causal link Dr. Silver should be excluded from testifying as a fact witness about the treatment he provided to Seamster. The court in *Vanderberg* reached a similar conclusion. *See* 906 F.3d at 707–08. After the district court granted the motion to exclude, it granted the defendant's motion for summary judgment because, under Iowa law, a plaintiff must provide expert testimony on causation "where there are multiple possible causes of an injury." *See id.* at 702, 704, 707–08.

But Virginia law[13] differs from Iowa law; under Virginia law "lay testimony of causal connection between an automobile accident and injury is admissible for whatever weight the fact finder may choose to give it, even when medical testimony fails to establish causal connection expressly." *Todt v. Shaw*, 286 S.E.2d 211, 213 (Va. 1982) (affirming district court's ruling that permitted the plaintiff and her husband to testify that she sustained certain injuries in an automobile accident); *see Bussey v. E.S.C. Rests., Inc.*, 620 S.E.2d 764, 768 (Va. 2005) (affirming district court's ruling that lay witness testimony of consuming spoiled meat, coupled with a doctor's diagnosis of food poisoning was sufficient to establish causation); *cf. Summers*

---

[13] While the issue of whether an expert is qualified to testify is governed by federal law, federal courts sitting in diversity apply state law to determine if expert testimony is required in certain cases. *See Benedict v. Hankook Tire Co.*, 286 F. Supp. 3d 785, 791 n.4 (E.D. Va. 2018) (collecting cases).

*v. Syptak*, 801 S.E.2d 422, 426 (Va. 2017) (distinguishing the inadmissibility of lay testimony to prove causation in medical malpractice cases, which are subject to a higher evidentiary standard by statute).

Seamster testified in his deposition that he sustained shoulder injuries in the accident, that his shoulders still cause him pain, and that he did not have shoulder pain prior to the accident. (Seamster Dep. at 9:5–10:22.) Seamster testified that "after the accident . . . [his] sleeping position was [a]ffected because of [his] shoulders" and that he had to sleep on his back. (*Id.* at 35:24–36:3.) And, when asked what injuries were bothering him as he was transported in an ambulance immediately after the accident, he stated "[a]t the time, my head and my shoulder." (*Id.* at 80:8–13.) These statements provide the causation testimony necessary to permit Dr. Silver to testify regarding the treatment he provided to Seamster post-accident.

Accordingly, the court will grant Defendants' motion to exclude Dr. Silver's expert testimony as to his opinion on the cause of Seamster's injuries but deny the motion insofar as it seeks to exclude Dr. Silver as a fact witness.

## IV.   CONCLUSION

For the above reasons, the court will grant in part and deny in part Seamster's motion to strike the affidavits and revised affidavits of Defendants' liability experts; grant Seamster's motion to exclude a portion of Black's expert testimony; deny Seamster's motion to exclude the expert testimony of Dr. Monk; grant in part and deny in part Defendants' motion to exclude the expert testimony of Whelan; and grant in part and deny in part Defendants' motion to exclude the expert testimony of Dr. Silver.

The clerk is directed to forward a copy of this Memorandum Opinion and accompanying Order to all counsel of record.

**ENTERED** this 15th day of June, 2022.

_/s/ Thomas T. Cullen_
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE